UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Republican National Committee, California Republican Party, Republican Party of San Diego County, and Michael Steele, | |
| Plaintiffs, | Civil No. 08-1953 (BMK)(RJL)(RMC) |
| v. | Three-Judge Court |
| Federal Election Commission, | |
| Defendant, | |
| Democratic National Committee and Representative Christopher Van Hollen, Jr., | |
| Intervenors. | |

Before: KAVANAUGH, Circuit Judge; LEON, District Judge; and COLLYER, District Judge.

**MEMORANDUM OPINION**

KAVANAUGH, Circuit Judge:

The Supreme Court's First Amendment jurisprudence establishes several principles regarding the regulation of campaign finance. First, Congress may impose some limits on contributions to federal candidates and political parties because of the *quid pro quo* corruption or appearance of *quid pro quo* corruption that can be associated with such contributions. Second, Congress may not limit expenditures by candidates and political parties. And third, Congress may not limit non-connected entities – including individuals, unincorporated associations, non-profit organizations, labor unions, and for-profit corporations – from spending or raising money

1

to support the election or defeat of candidates. *See Citizens United v. FEC*, 130 S. Ct. 876 (2010); *Davis v. FEC*, 128 S. Ct. 2759 (2008); *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007); *Randall v. Sorrell*, 548 U.S. 230 (2006); *McConnell v. FEC*, 540 U.S. 93 (2003); *Buckley v. Valeo*, 424 U.S. 1 (1976); *EMILY's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009).[1]

This case involves regulation in the first category – in this instance, statutory limits on contributions to political parties.

The Bipartisan Campaign Reform Act of 2002, known as BCRA, limits contributions to national, state, and local political parties. With respect to national political parties, BCRA's limits apply regardless of how a national party might want to use the money – for example, even if the party wishes to use the money to fund issue ads or state and local election activities. BCRA's limits on contributions to political parties are known as the soft-money bans. In 2003, the Supreme Court upheld those provisions against a facial First Amendment challenge. *See McConnell*, 540 U.S. 93.

Here, the Republican National Committee, the California Republican Party, the Republican Party of San Diego County, and the RNC Chairman bring a number of as-applied challenges to BCRA's restrictions on political-party fundraising. We conclude that plaintiffs' claims conflict with the Supreme Court's decision in *McConnell*. The Supreme Court's recent decision in *Citizens United* did not disturb *McConnell*'s holding with respect to the constitutionality of BCRA's limits on contributions to political parties. *See* 130 S. Ct. at 910-11 ("The BCRA record establishes that certain donations to political parties, called 'soft money,' were made to gain access to elected officials. This case, however, is about independent

---

[1] Because of the potential relationship of the questions presented in the Supreme Court's *Citizens United* reargument order to some of the questions at issue here, we awaited the Supreme Court's decision before deciding this case. Immediately after the Supreme Court issued its *Citizens United* decision, we ordered and promptly received helpful supplemental briefing on the impact of *Citizens United*.

2

expenditures, not soft money.") (citations omitted). As a lower court, we do not possess the authority to clarify or refine *McConnell* in the manner suggested by plaintiffs. We therefore GRANT the Federal Election Commission's motion for summary judgment, DENY plaintiffs' motion for summary judgment, and DISMISS AS MOOT the Federal Election Commission's motion to dismiss.

## LEGAL BACKGROUND

We begin by briefly summarizing the challenged provisions of BCRA, the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81.

Congress has long imposed source and amount limits on contributions to federal candidates. Congress also has long limited contributions to political parties to the extent the contributions are made for the purpose of influencing federal elections. *See* Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283, sec. 112(2), § 320(a)(1), 90 Stat. 475, 487 (codified as amended at 2 U.S.C. § 441a(a)(1)); *see also Buckley v. Valeo*, 424 U.S. 1, 13 n.12 (1976) (citing pre-1976 statutory provisions limiting contributions to candidates); *id.* at 38 (upholding limit on annual contributions to candidates, political committees, and political parties).

Before enactment of BCRA in 2002, federal law permitted national political parties to accept and use large, unlimited contributions – referred to as "soft-money" contributions – to help fund issue ads, purely state and local election activities, and mixed-purpose activities (for example, get-out-the-vote and voter registration in years when federal, state, and local candidates are all on the ballot). Some of those activities by the national parties could simultaneously

influence federal elections even though they did not expressly advocate the election or defeat of a federal candidate. *See McConnell v. FEC*, 540 U.S. 93, 122-24 (2003).

Congress enacted BCRA in part to plug this "soft-money loophole" that had "enabled parties and candidates to circumvent . . . limitations on the source and amount of contributions [made] in connection with federal elections." *Id.* at 126, 133. Among other changes, BCRA added § 323(a) and (b) to the Federal Election Campaign Act of 1971.

Section 323(a) applies to national political parties, as well as to officers or agents acting on their behalf. Under § 323(a), national parties may not solicit, receive, direct, or spend contributions over $30,400 annually from an individual donor, regardless of whether the national party might want to spend some of its money on non-federal-election activity such as issue ads or state and local activities. 2 U.S.C. § 441i(a); *see id.* § 441a(a)(1)(B); Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435, 7437 (Feb. 17, 2009).

In part to prevent circumvention of the limits on contributions to national parties, § 323(b) limits contributions to state and local political parties. The goal was to prevent unlimited donations to state and local party committees that those committees would then use to support the election or defeat of a federal candidate. Under § 323(b), with certain exceptions not at issue here, state, district, and local parties may not use any contributions over $10,000 received from an individual donor in a calendar year for any "Federal election activity." 2 U.S.C. § 441i(b); *see id.* § 441a(a)(1)(C). As relevant here, federal election activity under § 323(b) includes (1) any "voter registration activity" that occurs in the 120 days before a federal election; (2) any "voter identification, get-out-the-vote activity, or generic campaign activity" that is conducted "in connection with" an election in which a federal candidate appears on the ballot; and (3) any

"public communication" that promotes, supports, attacks, or opposes a clearly identified federal candidate. *Id.* § 431(20)(A)(i)-(iii). "Generic campaign activity" means activity that promotes a political party without promoting any specific candidate. *Id.* § 431(21). The provision applies to state and local political parties, as well as to officers or agents acting on their behalf.

Shortly after BCRA took effect in March 2002, a number of groups and individuals, including some of the parties here (the Republican National Committee and the California Republican Party), filed suit challenging the constitutionality of § 323 and other provisions of BCRA. The Supreme Court upheld § 323 in its entirety against a facial First Amendment challenge. *See McConnell*, 540 U.S. at 133-85.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs in this suit are the Republican National Committee, a national party committee subject to § 323(a); the California Republican Party, a state party committee subject to § 323(b); the Republican Party of San Diego County, a local party committee subject to § 323(b); and Michael Steele, the Chairman of the RNC, who is subject in his official capacity to the solicitation restrictions of § 323(a). *See* Amended Compl. for Declaratory and Injunctive Relief ¶¶ 11-14.[2] The defendant is the Federal Election Commission. Intervenors in support of the defendant are the Democratic National Committee and Representative Christopher Van Hollen, the Chairman of the Democratic Congressional Campaign Committee.

The RNC produced evidence that it seeks to raise and spend unlimited soft money in order to (1) support state candidates in elections where only state candidates appear on the ballot; (2) support state candidates in elections where both state and federal candidates appear on the

---

[2] When this action was originally filed, then-Chairman Robert M. Duncan was a named plaintiff. Plaintiffs later amended their complaint to replace Duncan with Michael Steele, who succeeded Duncan as Chairman of the RNC. Steele's claims are identical to those previously raised by Duncan.

ballot; (3) support state parties' redistricting efforts following the 2010 census; (4) support "grassroots lobbying efforts" aimed at educating and mobilizing voters around "legislation and issues"; (5) pay the fees and expenses attributable to this case and "other litigation not involving federal elections"; and (6) pay maintenance and upkeep expenses associated with the RNC's headquarters. *See* Mem. in Supp. of Pls.' Mot. for Summ. J. at 4-5.[3] In the RNC's view, the First Amendment entitles it to raise and spend soft money for those activities because they lack sufficient connection to a *federal* election. *See* Amended Compl. for Declaratory and Injunctive Relief ¶¶ 29-45.

In upholding the soft-money ban, *McConnell* relied in part on evidence showing that federal candidates and officeholders had solicited donations to their national party committees and that the national parties had sold access to federal officeholders and candidates in exchange for large contributions. In support of its as-applied challenges to BCRA § 323(a) and to surmount *McConnell*, the RNC produced evidence in the form of affidavits that it will no longer "use any federal candidates or officeholders to solicit" soft-money contributions. Mem. in Supp. of Pls.' Mot. for Summ. J. at 6. The RNC also submitted evidence it will not "aid" soft-money donors "in obtaining preferential access to federal candidates or officeholders." *Id.* at 5. Specifically, the RNC produced evidence that it will not arrange or facilitate meetings, conference calls, or other kinds of contact between soft-money contributors and federal candidates and officeholders "in any manner different than or beyond that currently afforded to contributors" of hard money. *Id.* at 5-6; *see also* Pls.' Statement of Undisputed Material Facts ¶¶ 24, 30; Aff. of Richard Clinton Beeson ¶ 19; Aff. of Robert M. "Mike" Duncan ¶ 6; Aff. of

---

[3] This list of proposed activities, which is drawn from Plaintiffs' Motion for Summary Judgment, differs slightly from the list found in Plaintiffs' Amended Complaint. *See* Amended Compl. for Declaratory and Injunctive Relief ¶¶ 16-21. None of those differences is material to the resolution of this case.

Michael Steele ¶ 6. As a result, a large soft-money contributor could obtain no better access to Republican officeholders or candidates – at least not RNC-arranged access – than a maxed-out hard-money contributor to the RNC (currently, one who gives $30,400 in a calendar year).[4]

For their part, the California Republican Party and the Republican Party of San Diego County produced evidence that they seek to raise and spend unlimited soft money to (1) produce and distribute public communications that advocate the passage or defeat of California ballot initiatives and incidentally criticize federal candidates; and (2) engage in voter registration, voter identification, get-out-the-vote activities, and "generic campaign activity" as defined in 2 U.S.C. § 431(21) in connection with elections where both state and federal candidates appear on the ballot, but not "targeted to" any federal race or candidate. See Amended Compl. for Declaratory and Injunctive Relief ¶¶ 23-25, 49-54.

Finally, Steele averred that he seeks to solicit soft-money contributions to the RNC's accounts, as well as soft-money contributions to state parties and state candidates, in his official capacity as RNC Chairman. See id. ¶¶ 22, 29-48.

Plaintiffs and the FEC filed cross-motions for summary judgment. Intervenors Representative Christopher Van Hollen and the Democratic National Committee filed briefs in opposition to plaintiffs' summary judgment motion. In considering a summary judgment motion, we "view the evidence in the light most favorable to the nonmoving party, draw all

---

[4] The FEC raised questions about how the RNC's pledge would be enforced. The RNC responded to this enforceability issue by asserting "that if it were to provide a [soft-money] donor with preferential access to a federal candidate or officeholder . . . then any contribution from such a donor would be illegal and in violation of FECA." Pls.' Reply Mem. in Supp. of Summ. J. at 20 n.24. At oral argument, counsel for the RNC reiterated that assertion. See Tr. of Oral Arg. at 48-49 (if RNC violates its no-preferential-access pledge, "then there is an illegal Federal contribution"). Counsel added that if the FEC suspected the RNC was not honoring its pledge, the FEC could initiate an investigation and require the RNC to disclose the names of invitees to its donor maintenance events. Id. at 49-50. Counsel also acknowledged, in response to a question from the court, that the FEC presumably could adopt regulations requiring such disclosures even outside the context of an investigation. Id. at 50. We find no reason that the RNC's pledge could not be meaningfully enforced by the FEC.

reasonable inferences in [its] favor, and eschew making credibility determinations or weighing the evidence." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008). We will grant a summary judgment motion if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

### I. Standard of Scrutiny

The initial issue concerns the proper standard of scrutiny. Under the Supreme Court's precedents, limits on campaign *expenditures* are subject to strict scrutiny. But limits on *contributions* to candidates and political parties are subject to "less rigorous scrutiny" and are valid if they are "closely drawn" to meet a "sufficiently important" governmental interest. *McConnell v. FEC*, 540 U.S. 93, 134-38 & n.40 (2003) (quoting *FEC v. Beaumont*, 539 U.S. 146, 162 (2003)); *see Buckley v. Valeo*, 424 U.S. 1, 25, 44-45 (1976). To be sure, every limit on contributions logically reduces the total amount that the recipient of the contributions otherwise could spend. But the Court has stated that this truism does not mean limits on contributions are simultaneously considered limits on expenditures that therefore receive strict scrutiny. *See Buckley*, 424 U.S. at 20-21; *see also Randall v. Sorrell*, 548 U.S. 230, 241-42, 246-47 (2006) (controlling opinion of Breyer, J.).

The *McConnell* Court ruled that all of the provisions of § 323 were contribution limits, and the Court thus applied "closely drawn" scrutiny rather than strict scrutiny. *McConnell*, 540 U.S. at 138-41. Plaintiffs in this case argue that we nonetheless must employ strict scrutiny. Plaintiffs contend that § 323's contribution limits will function as expenditure limits when applied to their proposed conduct. But that argument flies in the face of *McConnell*, which

squarely held that the level of scrutiny for regulations of contributions to candidates and parties does not turn on how the candidate or party chooses to spend the money or to structure its finances. Moreover, *Citizens United* expressly left intact this portion of *McConnell*. *See Citizens United v. FEC*, 130 S. Ct. 876, 909 (2010) ("Citizens United . . . has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny.").

## II. The Merits

### A. The Claims of the RNC

The RNC raises a variety of alternative arguments against the soft-money ban.

*First*, the RNC asserts that § 323(a) cannot constitutionally be applied to activities that are not "unambiguously related to the campaign of a particular federal candidate." *Buckley v. Valeo*, 424 U.S. 1, 80 (1976). Plaintiffs' proposed "unambiguously campaign related" standard is another way of describing the express advocacy test that courts used pre-*McConnell* for determining, among other things, which activities a party had to fund with hard money and which it could fund with its unlimited soft-money donations. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 123-24 (2003) (before BCRA, political parties could "use soft money to defray the costs of 'legislative advocacy media advertisements,' even if the ads mentioned the name of a federal candidate, so long as they did not expressly advocate the candidate's election or defeat"); *id.* at 283 (opinion of Thomas, J.) ("speech that is 'unambiguously campaign related,' *i.e.*, speech using words of express advocacy") (citation omitted). In other words, plaintiffs want the Court to permit large soft-money contributions so long as they are used to fund issue ads or state and local election campaigns. *McConnell* rejected this approach; indeed, this was the whole point of

BCRA's soft-money ban and of the *McConnell* decision upholding it. *See, e.g., id.* at 131-32 (BCRA sought to curb the political parties' use of soft-money contributions to fund "issue advertising" and state and local election activities that ultimately influenced federal elections and benefited federal candidates). This particular argument is another way of asking us to overrule *McConnell*'s holding with respect to the ban on soft-money contributions to national political parties. As a lower court, we of course have no authority to do so.

*Second*, the RNC relatedly argues that § 323(a) violates the First Amendment to the extent it applies to contributions that would be used for *non*-federal-election activities. The Supreme Court considered and rejected this argument in *McConnell*. The Court ruled that § 323(a) is not overbroad simply because it "subjects *all* funds raised and spent by national parties to FECA's hard-money source and amount limits, including, for example, funds spent on purely state and local elections in which no federal office is at stake." *Id.* at 154. The Court held that "large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, *regardless of how those funds are ultimately used.*" *Id.* at 155 (emphasis added).

It is true that *McConnell* permits as-applied challenges to the provisions of BCRA. *See Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 412 (2006). But *McConnell* upheld § 323(a) against a facial challenge based on the same applications of the statute that the RNC now raises in its as-applied challenge. In general, a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision. Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent. Therefore, to the extent the RNC is arguing that § 323(a) is unconstitutional because it applies to contributions

for non-federal-election activities, that argument fails in light of *McConnell*. Again, *Citizens United* expressly left this aspect of *McConnell* intact. *See Citizens United v. FEC*, 130 S. Ct. 876, 910-11 (2010) ("The BCRA record establishes that certain donations to political parties, called 'soft money,' were made to gain access to elected officials. This case, however, is about independent expenditures, not soft money.") (citations omitted).

*Third*, the RNC argues that no viable theory of corruption justifies these limits on contributions to political parties.

The RNC contends that *Citizens United* undermines any theory of limiting contributions to political parties that might have rested on the idea that large contributions to parties create gratitude from, facilitate access to, or generate influence over federal officeholders and candidates. On that threshold point, we agree with the RNC's interpretation of *Citizens United*. *See id.* at 909-10 ("When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption. The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt. . . . The appearance of influence or access, furthermore, will not cause the electorate to lose faith in our democracy.") (citations omitted); *id.* at 910 ("Ingratiation and access, in any event, are not corruption."). To the extent the FEC argues that large contributions to the national parties are corrupting and can be limited because they create gratitude, facilitate access, or generate influence, *Citizens United* makes clear that those theories are not viable.

But that is not enough for the RNC to prevail here because *McConnell*'s decision to uphold the soft-money ban rested on something more specific: record evidence of the *selling* of *preferential access* to federal officeholders and candidates in exchange for soft-money

contributions. *See McConnell*, 540 U.S. at 153-54 ("[I]t is the manner in which parties have *sold* access to federal candidates and officeholders that has given rise to the appearance of undue influence. . . . It was not unwarranted for Congress to conclude that the selling of access gives rise to the appearance of corruption."); *see also Citizens United*, 130 S. Ct. at 910 ("The BCRA record establishes that certain donations to political parties, called 'soft money,' were made to gain access to elected officials.").

The RNC, in turn, responds that *McConnell*'s rationale does not control this as-applied challenge because the RNC has now pledged to end its role as an intermediary for such transactions by (1) not involving federal candidates or officeholders in its soft-money solicitations; and (2) not granting soft-money donors preferential access to candidates or officeholders based on their large, soft-money contributions. *See* Mem. in Supp. of Pls.' Mot. for Summ. J. at 5-6. The RNC contends that it therefore is entitled to an as-applied exemption from § 323(a) with respect to its use of soft money for non-federal-election activities.

The RNC's as-applied argument – advanced as a way of distinguishing *McConnell* – carries considerable logic and force. After all, the RNC is right that *McConnell*, in upholding the across-the-board ban on national parties' raising and spending soft money for any purpose, relied heavily on evidence that national party committees had sold preferential access to federal officeholders and candidates in exchange for large soft-money donations. *See, e.g., McConnell*, 540 U.S. at 150-52 (describing record evidence of a "pervasive" practice of "national party committees peddling access to federal candidates and officeholders in exchange for large soft-money donations"); *id.* at 153-54 ("it is the manner in which parties have *sold* access to federal candidates and officeholders that has given rise to the appearance of undue influence"); *id.* at 156 ("Congress had sufficient grounds to regulate the appearance of undue influence associated with"

a practice in which "large soft-money donations to national party committees are likely to buy donors preferential access to federal officeholders"); *see also EMILY's List v. FEC*, 581 F.3d 1, 13 & n.12 (D.C. Cir. 2009).

According to the RNC, removing that factual element from the equation would largely eliminate the problem the *McConnell* Court cited in finding § 323(a) constitutional. The RNC argues that if the soft-money contributions are not used for federal-election activities, if federal officeholders and candidates are not involved in solicitation of the contributions, and if the contributions facilitate no greater RNC-arranged access to federal candidates or officeholders than a maxed-out hard-money contributor receives, there can be no corruption or appearance of corruption from the soft-money contributions.

The problem for the RNC – at least at this District Court level – is that the *McConnell* Court, in upholding § 323(a), appeared to rely not only on the selling of access in exchange for soft-money contributions, which is arguably resolved by the RNC's pledge to no longer grant soft-money contributors preferential access, but also on "the close relationship between federal officeholders and the national parties." 540 U.S. at 154; *see also id.* at 152 (describing "the close ties that candidates and officeholders have with their parties"). The Court observed, for example, that there was "no meaningful separation between the national party committees and the public officials who control them," because the national committees were "run by, and largely composed of, federal officeholders and candidates." *Id.* at 155 (internal quotation omitted). The Court also noted that because the national parties were "inextricably intertwined with federal officeholders and candidates, . . . there is a close connection between the funding of the national parties and the corrupting dangers of soft money on the federal political process." *Id.* (internal quotation omitted). The Court stated that "[g]iven this close connection and

alignment of interests, large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, regardless of how those funds are ultimately used." *Id.*; *see also id.* at 145 ("federal candidates and officeholders enjoy a special relationship and unity of interest" with national political parties, and this "close affiliation has placed national parties in a unique position, whether they like it or not, to serve as agents for spending on behalf of those who seek to produce obligated officeholders") (quoting *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 452 (2001)) (internal quotation marks omitted). The Court summarized the point as follows: "[I]t is the close relationship between federal officeholders and the national parties, as well as the means by which parties have traded on that relationship, that have made all large soft-money contributions to national parties suspect." *Id.* at 154-55.

In relying in part on the inherently close relationship between parties and their officeholders and candidates, the Court suggested that federal officeholders and candidates may value contributions to *their national parties* – regardless of how those contributions ultimately may be used – in much the same way they value contributions to *their own campaigns*. As a result, the reasoning goes, contributions to national parties have much the same tendency as contributions to federal candidates to result in *quid pro quo* corruption or at least the appearance of *quid pro quo* corruption. *See id.* at 144 ("contributions to a federal candidate's party in aid of that candidate's campaign threaten to create – no less than would a direct contribution to the candidate – a sense of obligation"); *cf. Buckley*, 424 U.S. at 23-29 (upholding FECA's limits on direct contributions to candidates and their campaign committees); *EMILY's List*, 581 F.3d at 14 ("non-profit groups do not have the same inherent relationship with federal candidates and

officeholders that political parties do"). And the *McConnell* Court appears to have upheld § 323(a) at least in part for that reason. *See McConnell*, 540 U.S. at 154-55.

We acknowledge that the *McConnell* opinion is ambiguous on the question whether the "unity of interest" between national parties and their candidates and officeholders was an independently sufficient rationale for the Court to uphold the blanket ban on soft-money contributions to national parties. In due course, the Supreme Court will have the opportunity to clarify or refine this aspect of *McConnell* as the Court sees fit, and to consider the RNC's challenge to § 323(a) in light of the RNC's pledge to no longer grant preferential access to soft-money contributors. As a lower court, however, we do not believe we possess authority to clarify or refine *McConnell* in the fashion advocated by the RNC, or to otherwise get ahead of the Supreme Court. *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

Therefore, we reject the RNC's challenges to § 323(a) as a matter of law and grant the FEC's motion for summary judgment with respect to those claims.[5]

### B. The Claims of the California Republican Party and the Republican Party of San Diego County

Next, we consider the claims of the state and local party plaintiffs, the California Republican Party and the Republican Party of San Diego County. They target § 323(b), which

---

[5] The current mix of statutes, regulations, and court decisions has left a campaign finance system that reduces the power of political parties as compared to outside groups. *See Citizens United*, 130 S. Ct. 876; *EMILY's List*, 581 F.3d at 19. Under current law, outside groups – unlike candidates and political parties – may receive unlimited donations both to advocate in favor of federal candidates and to sponsor issue ads. We recognize the RNC's concern about this disparity, which, it argues, discriminates against the national political parties in political and legislative debates. But that is an argument for the Supreme Court or Congress. As a lower court, it is not our place to reassess the constitutionality of limits on contributions to political parties that the Supreme Court has upheld. And it is not our role to question Congress's policy choice to limit contributions to political parties.

prohibits them from using soft-money contributions for any "Federal election activity." They contend that § 323(b) is unconstitutional as applied to their proposed activities, which they concede fall within the statutory definition of federal election activity. Specifically, they assert that the First Amendment entitles them to receive and spend soft-money contributions (that is, contributions above the current $10,000 annual limit) on (1) public communications that promote the California Republican Party's position on California ballot initiatives and incidentally criticize or oppose federal candidates; and (2) voter registration, voter identification, get-out-the-vote activities, and "generic campaign activity" in connection with elections where both state and federal candidates appear on the ballot, but not "targeted to" any federal race or candidate.[6]

In *McConnell*, the Supreme Court squarely rejected those claims. There, the Court upheld § 323(b) against a facial First Amendment challenge. In so doing, the Court considered the argument that § 323(b) was overbroad because it applied to expenditures by state and local parties that allegedly "pose no conceivable risk of corrupting or appearing to corrupt federal officeholders." *McConnell*, 540 U.S. at 166. The Court rejected that argument on the ground that the statute "is narrowly focused on regulating contributions that pose the greatest risk" of corrupting federal candidates by placing them "in the debt of the contributor" – namely, contributions that state and local parties could use "to benefit federal candidates directly." *Id.* at 167. The Court examined each of the categories of activity that § 323(b) requires state and local parties to pay for with hard money, and it found that expenditures in each category had a significant potential to "directly assist" federal candidates. *See id.* at 167-71.

---

[6] Like the RNC, the California Republican Party and the Republican Party of San Diego County argue that the soft-money ban cannot constitutionally be applied to activities that are not "unambiguously related to the campaign of a particular federal candidate." As we explained above, that argument falters under *McConnell*.

As we explained in the previous section, we of course understand that the Supreme Court's analysis of § 323(b) permits as-applied challenges based on the kind of expenditure at issue. *Cf. Wisconsin Right to Life*, 546 U.S. at 412. But as with § 323(a), the as-applied arguments raised against § 323(b) are essentially the same arguments considered and rejected in *McConnell*. There is nothing substantially new presented in plaintiffs' as-applied challenge to § 323(b).

With respect to advertisements paid for by state and local parties, for example, the *McConnell* Court stated that "'[p]ublic communications' that promote or attack a candidate for federal office . . . undoubtedly have a dramatic effect on federal elections." 540 U.S. at 169. Noting that such ads "were a prime motivating force behind BCRA's passage," the Court concluded that "any public communication that promotes or attacks a clearly identified federal candidate directly affects the election in which he is participating." *Id.* at 169-70. Therefore, the Court found § 323(b) closely drawn to the Government's anti-corruption interest. *Id.* at 170.

Plaintiffs do not distinguish their proposed ads from the category of state and local party advertising that the Supreme Court expressly considered in *McConnell*. They allege only that their ads will be "targeted" primarily at state ballot initiatives and that their attacks on federal candidates will be incidental to that purpose. But nothing in *McConnell* suggests that the question whether a state or local party's communication implicates the federal anti-corruption interest depends on whether the communication is "targeted" at federal elections. Indeed, *McConnell* stated that "*any* public communication" by a state or local party that "attacks a clearly identified federal candidate" implicates the federal anti-corruption interest. *Id.* (emphasis added). Under *McConnell*, Congress can require that such party communications be funded with

17

the party's hard money (that is, with contributions to the party that are subject to source and amount limits). *Id.*

The *McConnell* Court also held that "voter registration efforts and voter identification, GOTV [get-out-the-vote], and generic campaign activities conducted in connection with a federal election clearly capture activity that benefits federal candidates" because "federal candidates reap substantial rewards from any efforts that increase the number of like-minded registered voters who actually go to the polls." *Id.* at 167-68 (citations omitted). The Court concluded that because all of those activities "confer substantial benefits on federal candidates, the funding of such activities creates a significant risk of actual and apparent corruption," and therefore Congress could require that such activities be funded with hard money. *Id.* at 168.

Again, plaintiffs have not distinguished their proposed activities from the categories of state and local party activities the Supreme Court considered in *McConnell*. They simply assert that their voter drives and generic campaign activities will not be "targeted" at any federal election. Even taking that assertion as true, it has no legal relevance under *McConnell*. The Supreme Court made clear that whether § 323(b) can be constitutionally applied to a particular state or local party activity depends, not on whether the party's primary "target" is federal, but on whether the activity would provide a direct benefit to federal candidates. Plaintiffs do not deny that their proposed activities would provide such a benefit. Therefore, we reject plaintiffs' as-applied challenges to § 323(b) as a matter of law.

C. The Claims of the RNC Chairman

Finally, we consider the RNC Chairman's as-applied challenges. Under the Supreme Court's precedent, the RNC is not entitled to raise, receive, or spend soft money for *any* purpose.

It necessarily follows that the Chairman cannot solicit soft-money contributions to the RNC's accounts. *See id.* at 157-58.

The Chairman also wants to solicit soft-money contributions to *state* parties and candidates, and he contends that § 323(a) is unconstitutional as applied to such solicitations. That claim is also foreclosed by *McConnell*. There, the Supreme Court upheld § 323(a) insofar as it prohibits national party committees, and party officers in their official capacities, from *soliciting or directing* soft-money contributions on behalf of state committees and state and local candidates. *Id.* The Court reasoned that the restriction on solicitation "follows sensibly from the prohibition on national committees' receiving soft money," because a "national committee is likely to respond favorably to a donation made at its request regardless of whether the recipient is the committee itself or another entity." *Id.*

In other words, the Court's rationale for upholding the solicitation restriction was the same as its rationale for holding that *all* soft-money contributions to national parties can be regulated, regardless of how they are used. If Congress can prohibit a national party from *spending soft money from its own accounts* to support state parties and candidates, it follows that Congress can also prohibit the national party from raising soft money *on behalf of* state parties and candidates. Under *McConnell*, there is no reason to think that contributions made *to* a national party and contributions made *at the behest of* a national party are any different in terms of their potential ability to produce corruption or the appearance of corruption.

In discussing § 323(a)'s restriction on solicitation, the Court did observe that under the statute, "officers of national parties are free to solicit soft money in their individual capacities." *Id.* at 157. Thus, under *McConnell*, the Chairman may solicit soft-money donations on behalf of state and local parties and candidates, so long as he does so in his individual capacity and does

not use RNC resources or his title as Chairman of the RNC to further his fundraising efforts. Plaintiffs' amended complaint, however, specifically asserts that the Chairman "intends to make the described solicitations in his official capacity as RNC Chairman on behalf of RNC." Amended Compl. for Declaratory and Injunctive Relief ¶ 22. Thus, we reject the Chairman's as-applied challenges to § 323(a) as a matter of law.[7]

## CONCLUSION

The FEC's motion for summary judgment is GRANTED, plaintiffs' motion for summary judgment is DENIED, and the FEC's motion to dismiss is DISMISSED AS MOOT.

This the 26th day of March, 2010.

_____
BRETT M. KAVANAUGH
United States Circuit Judge

_____
RICHARD J. LEON
United States District Judge

_____
ROSEMARY M. COLLYER
United States District Judge

---

[7] Because we find that all of plaintiffs' claims are foreclosed on their merits, we need not consider the FEC's argument that some of the claims are also barred by *res judicata*. *See In re Franklin Sav. Corp.*, 385 F.3d 1279, 1286 (10th Cir. 2004) (*res judicata* not a jurisdictional issue).